# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Patricia Fitzpatrick and Robert L. Ansara, as special co-administrators and special representatives of the Estate of Jeremiah Bowling, deceased; and Patricia Fitzpatrick, as heir and mother of Jeremiah Bowling, deceased, <br><br> Plaintiffs <br><br> v. <br><br> Las Vegas Metropolitan Police Department, et al., <br><br> Defendants | Case No.: 2:17-cv-01886-JAD-BNW <br><br> **Order Granting Defendant Naphcare Inc.'s Motion to Dismiss, Overruling Defendant LVMPD's Objection to the Magistrate Judge's Order Granting Plaintiffs' Motion to Compel, and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment** <br><br> [ECF Nos. 86, 93, 123] |

This civil-rights action arises out of Jeremiah Bowling's death at the hands of his cellmate Franklin Sharp while they were inmates at Clark County Detention Center (CCDC). Bowling's representatives, Patricia Fitzpatrick and Robert L. Ansara,[1] sue the Las Vegas Metropolitan Police Department (LVMPD); Corrections Officers Thomas Streimer, Angelo Larry, Rolando Trevino; and Naphcare Inc., the detention center's contracted medical provider, asserting constitutional and tort claims premised on the theory that Naphcare, LVMPD, and various staff members are responsible for Bowling's death because Sharp had a history of attacking his cellmates and staff.[2]

Naphcare moves to dismiss the claims against it, arguing that Fitzpatrick failed to attach an expert affidavit as required under Nevada law when pleading medical-negligence claims, and

---

[1] Patricia Fitzpatrick and Robert L. Ansara (together, "Fitzpatrick"), sue as special co-administrators and special representatives of Bowling's estate, and Patricia Fitzpatrick also sues as Bowling's heir and mother.

[2] ECF No. 72 (fourth amended complaint).

that Fitzpatrick has not shown that Naphcare is liable under *Monell* for her constitutional claims.[3] Because I find that the factual allegations against Naphcare are too thin for me to find plausible claims, I grant the motion to dismiss, but I give Fitzpatrick until February 13, 2020, to file an amended complaint.

LVMPD and each of the three officers object to Magistrate Judge Brenda Weksler's ruling granting in part and denying in part Fitzpatrick's motion to compel production of inmate-locator cards that CCDC used for Bowling and Sharp and to complete the deposition of LVMPD's Rule 30(b)(6) witness.[4] Defendants' objection concerns only the timeliness of the motion to compel, which Fitzpatrick filed after the discovery and dispositive-motion deadlines. I find that the magistrate judge's order was neither clearly erroneous nor contrary to law. And because she outlined the unusual circumstances that warranted her consideration of the late motion to compel, I overrule the defendants' objection.

LVMPD and each of the three officers also move for summary judgment on Fitzpatrick's claims under 42 U.S.C. § 1983 for deprivation of Bowling's constitutional rights and a state-law wrongful-death claim, arguing that the officers were not aware that Sharp posed a significant risk of substantial harm to Bowling and therefore could not be deliberately indifferent to his safety. Alternatively, they argue that they are entitled to qualified and discretionary immunity for the federal and state claims. Defendants also argue that there is no evidence of a widespread policy showing that LVMPD was deliberately indifferent to inmate safety as required to establish *Monell* liability.[5] Because Fitzpatrick concedes that summary judgment is appropriate for

---

[3] ECF No. 93.

[4] ECF No. 123.

[5] ECF Nos. 86, 87 (motions for summary judgment).

officers Larry and Trevino, I grant summary judgment in favor of those defendants on all claims. I also grant summary judgment to LVMPD because Fitzpatrick has not shown that there was a department-wide policy that demonstrated a deliberate indifference to inmate safety. But genuine issues of material fact about whether Officer Streimer heard Sharp attack Bowling minutes before his last visual check and whether he conducted a proper visual check prevent me from granting summary judgment in favor of Officer Streimer. These same open factual questions prevent me from granting Officer Streimer summary judgment on Fitzpatrick's wrongful-death claim.

**Background**

## I.  Bowling's death at CCDC

On August 6, 2016, Jeremiah Bowling was arrested and transported to CCDC for grand larceny auto.[6]  Bowling pleaded guilty to the charge and remained at CCDC while awaiting formal sentencing.[7]  Bowling did not have a prior criminal history, violent or otherwise.[8]

Based on Naphcare's medical and mental-health assessment of Bowling, LVMPD initially assigned him to minimum-security custody.[9]  LVMPD later reassigned Bowling to close-security custody after two behavioral violations—interrupting a razor pass by walking to the restroom and failing to follow orders not to talk—and after a brief stay on suicide watch.[10]  Bowling was assigned to a double cell with Franklin Sharp in Module 3B, Cell 21 on September

---

[6] ECF No. 88-2 (declaration of arrest).

[7] ECF No. 88-3 (guilty-plea agreement).

[8] ECF No. 99-7 at 2 (Bowling's locator card).

[9] ECF No. 88-5 (Naphcare assessment), ECF No. 88-4 (classification records).

[10] *Id.*

26, 2016.[11] Unlike Bowling, Sharp had a criminal history of violence in and out of jail, including post-incarceration charges for attempted murder, battery by prisoner, and battery by strangulation for attacking his previous cellmate, Joseph Barrese, at CCDC earlier that month.[12]

On October 8, 2016, Corrections Officers Thomas Streimer, Angelo Larry, and Rolando Trevino began a new rotation on Module 3 at CCDC.[13] Officer Streimer had the day shift on Module 3B and was relieved by Officer Larry around 5:00 p.m.[14] Officer Trevino was finishing his day shift in Module 3A nearby.[15] Neither of them had supervised Bowling or Sharp in Module 3B before.[16]

Three inmate workers had been cleaning the unit after dinner while other inmates were on lockdown, and they heard Sharp attack Bowling.[17] Some approached Cell 21 and told Sharp to stop. Another inmate who was on the phone with his girlfriend from a phone bank a few feet away described the thrashing in Cell 21.[18] The call's transcript shows him telling another inmate to grab a mop to clean up the blood that was coming out from under the Cell 21. Surveillance video shows the inmates approaching Cell 21 and Officer Streimer conducting his final visual

---

[11] ECF No. 99-7 (Bowling and Sharp's locator cards).

[12] *Id*. at 4. Fitzpatrick alleges that the CCDC had a flawed design that contributed to inmate deaths, as discovered during an investigation by the U.S. Department of Justice in 1998. ECF No. 72 at 24. And she asserts that this flawed design and defendants' pattern of misclassifying inmates contributed to other attacks: Sharp's attack on Barrese, and another case from 2011 in which inmate Carl Guilford allegedly killed his cellmate, Francesco Sanfilippo. *Id*. at 23.

[13] ECF Nos. 88-6 (Streimer's deposition), 89-1 (Larry's deposition), 90-1 (Trevino's deposition).

[14] ECF Nos. 88-6 at 28, 89-1 at 29.

[15] ECF No. 90-1 at 23–24.

[16] ECF Nos. 88-6 at 20–21, 89-1 at 39, 90-1 at 22.

[17] ECF Nos. 99-9, 100-2, 100-1.

[18] ECF Nos. 90-3 at 15, 100-1.

check of his shift less than five minutes later.[19]  Prior to that, Officer Streimer was either at the desk at the unit's entrance or not visible in the unit.

As required by CCDC's policies, Officer Larry began his bi-hourly visual checks of the cells around 5:30 p.m.[20]  When he got to Cell 21, Sharp was standing in front of the window, washing his face and hair in the water basin inside the cell.[21]  Officer Larry ordered Sharp to step away so that he could see Bowling.[22]  Officer Larry saw Bowling lying face down on the ground with blood around his waist and "called a code 99" for immediate medical attention.[23]  Officer Trevino responded within seconds and upgraded the code to get more backup for Bowling.[24]

Officer Trevino entered the cell while Officer Larry arrested Sharp.[25]  There wasn't blood coming from under the door, but there was a trail of blood going from the door to a dried-up pool near Bowling.[26]  Bowling was unresponsive.[27]  Officer Trevino pulled Bowling out of the cell to allow the medical staff more room to work.[28]  Despite life-saving efforts at CCDC and the University Medical Center Trauma Center, Bowling was pronounced dead.[29]  His cause of death was a combination of cardiac arrest from asphyxiation and facial trauma.[30]

---

[19] ECF No. 99-4.

[20] ECF No. 89-1 at 43.

[21] *Id.* at 43–44.

[22] *Id.* at 44.

[23] *Id.* at 44–45.

[24] *Id.* at 44.

[25] ECF No. 90-1 at 21.

[26] ECF No. 89-1 at 44–45.

[27] ECF No. 90-1 at 21.

[28] *Id.*

[29] ECF No. 90-4 (hospital report).

[30] *Id.*

## II.     Procedural background

Fitzpatrick alleges causes of action under 42 U.S.C. § 1983 for violations of Bowling's rights under the Eighth and Fourteenth Amendments against LVMPD, Naphcare, several doe corrections officers, classification officers, and health care providers; a municipal-liability claim under §1983 against LVMPD, Naphcare, and doe health care providers; a wrongful-death claim under Nevada Revised Statute § 41.085 against all defendants; and a negligence claim against Naphcare and doe health care providers.[31]

### A.     Fitzpatrick's requests for production

In March 2018, Fitzpatrick requested the production of the inmate files for both Bowling and Sharp, including locator cards for each.[32]  Fitzpatrick believed that the locator card for Sharp, which Officer Streimer would have had to review the day of Bowling's death, showed that Sharp had attempted to kill a different cellmate one month earlier, and this information would have alerted Officer Streimer that Sharp was a risk to Bowling.[33]  Defendants did not produce the locator cards with their initial responses in June 2018,[34] and their supplemental disclosures omitted Sharp's locator card as it existed before the attack.[35]  Fitzpatrick followed up

---

[31] ECF No. 72.

[32] ECF No. 107-1.  Corrections officers create and use inmate-locator cards to track inmates' housing assignments, among other things.  ECF No. 103 at 10–12, n.1.  They contain identifying information, charges, previous housing assignments, and booking and medical information.  *Id*.  Corrections officers use the cards to conduct "a face-to-face count once a day to verify" that the correct inmates are in the right cells.  *Id*. at 11.

[33] ECF No. 103 at n.1.

[34] *Id*. at 4.

[35] *Id*.

on the production request by attempting to meet and confer with defendants through their counsel and, later, through a mediator, but was unsuccessful.[36]

In November 2018, Fitzpatrick also noticed the deposition of LVMPD's Rule 30(b)(6) designees.[37] The parties scheduled the deposition of Sergeant Albright, the first of defendants' Rule 30(b)(6) designees, for December 12, 2018.[38] During the deposition, however, the parties decided to mediate the case and scheduled the mediation for March 21, 2019, before a retired Nevada Supreme Court Justice.[39] With the December 17 discovery cut-off deadline five days away, the parties stipulated to stay discovery pending mediation.[40] But the court denied the stipulation the following January.[41] It allowed the parties until April 2, 2019, to complete the Rule 30(b)(6) deposition for LVMPD if the mediation failed, and it extended the dispositive-motion deadline to April 18, 2019.

The mediation was interrupted, however, when counsel for LVMPD left for a family medical emergency,[42] and the parties did not reschedule it. Fitzpatrick declares that she repeatedly contacted defendants' counsel after the truncated mediation and before April 2, but defendants' counsel did not respond.[43] Instead, defendants moved for summary judgment,[44] but Fitzpatrick insisted that defendants schedule the remainder of the deposition before April 17 (15

---

[36] ECF No. 103 at 4.

[37] ECF No. 103-3.

[38] ECF No. 81.

[39] *Id.*

[40] *Id.*

[41] ECF No. 82.

[42] ECF No. 84.

[43] ECF No. 103 at 6.

[44] ECF No. 86.

days after the close of discovery).[45]  Fitzpatrick also opposed the motion for summary judgment, "detail[ing] the crucial nature of the missing [l]ocator [c]ards," and asked the court to defer its consideration of the motion until she obtained the outstanding discovery.[46]

### B.     Fitzpatrick's motion to compel

Fitzpatrick moved to compel the production of inmate locator cards for Sharp and Bowling as they existed the day Sharp killed Bowling, for an adverse jury instruction as a sanction for spoliation of that evidence (if they had been destroyed), to compel defendants' designation and production of FRCP 30(b)(6) witnesses for deposition, and for the attorney's fees and costs Fitzpatrick incurred in bringing the motion to compel.[47]  Defendants opposed the motion as untimely because Fitzpatrick filed it after discovery had closed and the dispositive-motion deadline had passed.[48]  They added that Fitzpatrick had not diligently pursued discovery of the locator cards and had failed to comply with the court-ordered deposition deadline of April 2, 2019.

Magistrate Judge Weksler granted in part and denied in part the motion to compel, explaining that she would consider the motion to compel, despite its late filing, because "unusual circumstances" made it so that "there was not a clear end to mediation" or deadline to file discovery motions.[49]  Judge Weksler found that "it is possible that the missing locator card that existed on the day of the murder contained a 'do not house with' designation that could be key to

---

[45] ECF No. 123-1.

[46] ECF No. 103 at 4; ECF No. 98.

[47] ECF No. 103.

[48] ECF No. 107.

[49] ECF No. 114.

[Fitzpatrick's] case."[50]  Because there remained a question about whether defendants had destroyed the locator cards, Judge Weksler denied Fitzpatrick's spoliation-sanction and fee requests and ordered defendants to produce the additional locator cards, if any, and to update the court with a status report.[51]  Judge Weksler also ordered defendants to produce Sergeant Albright for the remainder of the half-completed deposition, but she denied Fitzpatrick's request that defendants produce additional 30(b)(6) designees because Fitzpatrick had not attempted to complete those depositions before the mediation nor asked for relief from the April 2 deposition deadline.[52]

## Discussion

I.    **Defendants' objection to Magistrate Judge Weksler's order granting in part and denying in part plaintiff's motion to compel [ECF No. 123].**

   A.    **Standard for objections to a magistrate judge's ruling on a motion to compel production**

When a litigant challenges a magistrate judge's ruling on a pretrial matter like this one, she must show that the "order is clearly erroneous or contrary to law."[53]  The clearly erroneous standard applies to a magistrate judge's findings of fact.[54]  "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing body on the entire evidence is left with the definite and firm conviction that a mistake has been committed."[55]  A magistrate judge's

---

[50] *Id*. at 5 (footnote omitted).

[51] *Id*.  at 9.

[52] *Id*. at 10.

[53] 28 U.S.C. § 636(b)(1)(A); LR IB 3-1(a).

[54] *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 623 (1993).

[55] *Id*. at 622 (internal quotation marks and citation omitted).

order "is contrary to law when it fails to apply or misapplies relevant statutes, case law[,] or rules of procedure."[56]  "The district judge may affirm, reverse, or modify in whole or in part, the magistrate judge's order" or "remand the matter to the magistrate judge with instructions."[57]

The general rule is that a motion to compel should be filed before the dispositive-motion deadline; however, a court may consider a motion to compel filed after that deadline if "unusual circumstances" warrant it.[58]  Courts have discretion in determining what facts constitute unusual circumstances, including the proximity to the discovery deadline, whether and how long the moving party was aware of the deficiencies with the discovery, whether the delay "was caused by matters outside the [moving party's] control," whether the court has ruled on a motion for summary judgment despite the missing discovery at issue, and proximity to trial.[59]

### B.    Defendants have not shown that the magistrate judge's ruling was clearly erroneous or contrary to law.

Defendants argue that it was clear error for the magistrate judge to consider the motion to compel because Fitzpatrick's "confusion about the application of clear and unambiguous [c]ourt[-]ordered deadlines" isn't an unusual circumstance.[60]  Characterizing the motion to compel as a motion to reopen discovery or extend the discovery deadlines under Local Rules 26-4 and 6-1(b), they argue that Fitzpatrick has not shown good cause, excusable neglect, or due diligence in obtaining the locator cards and depositions.[61]  Finally, defendants argue that they

---

[56] *Glob. Advanced Metals USA, Inc. v. Kemet Blue Powder Corp.*, 2012 WL 3884939, at *3 (D. Nev. Sept. 6, 2012).

[57] LR IB 3-1(b).

[58] *Gault v. Nabisco Biscuit Co.*, 184 F.R.D. 620, 622 (D. Nev. 1999).

[59] *See, e.g.*, *id.*

[60] ECF No. 123 at 8.

[61] *Id.* at 14.

would be prejudiced by the additional discovery because they would have to amend their motion for summary judgment.[62]

Fitzpatrick responds that defendants have not met their burden of showing that the order was clearly erroneous or contrary to law because: (1) defendants cannot point to a binding case that requires a magistrate judge to deny a motion to compel filed after the dispositive-motion deadline; (2) a magistrate judge has the discretion to determine whether case-specific, unusual circumstances warrant consideration of a such a motion; (3) Judge Weksler articulated the unusual circumstances in this case that justified her consideration of the motion to compel, none of which involved confusion about deadlines, and noting that defendants failed to address them in their objection; and (4) defendants mischaracterize the motion as one seeking to reopen discovery under Local Rules 26-4 and 6-1(b) when they merely seek to compel the production of previously requested discovery under FRCP 37.[63]

Judge Weksler explained in detail the unusual circumstances in this cases that warranted her consideration of the motion to compel. With regard to the locator cards, she explained that: "(1) [Fitzpatrick] properly sought the locator cards during discovery and followed up on [her] request until discovery ended in an unusual manner[,] (2) Defendants' statements to Plaintiffs about the existence of additional locator cards were ambiguous[,] (3) Defendants[ ] potential[ly] fail[ed] to meet their obligations to search electronic records for locator cards[,] and (4) Defendants[ ] potential[ly spoliated] evidence."[64] Underlying her determination was the fact that Fitzpatrick continuously requested the cards, which defendants did not produce until the eve of

---

[62] *Id*. at 17.

[63] ECF No. 125.

[64] ECF No. 114 at 7–9.

Sergeant Albright's scheduled deposition and, even then, omitted at least one card. As Judge Weksler put it, this was not a situation where Fitzpatrick "either did not request the sought-after documents during discovery or sat on [her] hands after they were not produced."[65] Fitzpatrick continued to request the missing cards after discovery closed, and defendants responded that they had already produced what they had, only to admit at the hearing on the motion to compel that a different card existed on the day Sharp killed Bowling, but that it was no longer available.[66] Regarding the Rule 30(b)(6) designee requests, Judge Weksler determined that additional unusual circumstances militated towards considering the late-filed motion: in the middle of Sergeant Albright's deposition, the parties agreed to mediate the matter; they also stipulated to stay discovery and the deposition until after the mediation, but the court denied the stipulation; and the mediation ended abruptly due to a medical emergency.[67]

Defendants have not identified, and I have not found, any controlling authority prohibiting a court from considering a motion to compel that is filed after the dispositive-motion deadline. I am not persuaded by their attempt to recharacterize the motion to compel as one seeking to reopen discovery or to extend the discovery deadline—this motion is limited only to the production requests for the locator cards and a single Rule 30(b)(6) designee. Even if I were to construe the motion as an extension request, Fitzpatrick was diligent in seeking the discovery, defendants' bad-faith and inexcusable-neglect arguments lack support, and defendants' admission that a different locator card existed for Sharp on the day of the incident and was not produced undermines those arguments. I thus overrule defendants' objection.

---

[65] *Id.* at 7–8.

[66] *Id.* at 8.

[67] *Id.* at 9.

## II.    Naphcare, Inc.'s motion to dismiss Fitzpatrick's fourth amended complaint [ECF No. 93].

Fitzpatrick alleges that Naphcare is liable for Bowling's death under wrongful-death and negligence theories found in Nevada tort law, and under the Fourteenth and Eighth Amendments based on a *Monell* theory of liability.[68]  Naphcare asserts two bases for dismissing Fitzpatrick's claims.  First, Naphcare contends that Fitzpatrick's state-law claims are grounded in professional medical negligence and must be dismissed because she failed to attach the expert affidavit required by NRS § 41A.071.[69]  Second, Naphcare argues that it is not liable under *Monell* because Fitzpatrick failed to allege a policy or practice that caused Bowling's injury or that Naphcare made a deliberate or conscious choice to adopt such a policy.[70]

### A.    Motion-to-dismiss standard

Federal Rule of Civil Procedure 8 requires every complaint to contain "[a] short and plain statement of the claim showing that the pleader is entitled to relief."[71]  While Rule 8 does not require detailed factual allegations, the properly pled claim must contain enough facts to "state a claim to relief that is plausible on its face."[72]  This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"; the facts alleged must raise the claim "above the

---

[68] ECF No. 72 at 11, 17, 29, 31.

[69] ECF No. 93.

[70] *Id*. at 7–8.

[71] Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

[72] *Twombly*, 550 U.S. at 570.

speculative level."[73]  In other words, a complaint must make direct or inferential allegations about "all the material elements necessary to sustain recovery under *some* viable legal theory."[74]

District courts employ a two-step approach when evaluating a complaint's sufficiency on a Rule 12(b)(6) motion to dismiss.  The court must first accept as true all well-pled factual allegations in the complaint, recognizing that legal conclusions are not entitled to the assumption of truth.[75]  Mere recitals of a claim's elements, supported by only conclusory statements, are insufficient.[76]  The court must then consider whether the well-pled factual allegations state a plausible claim for relief.[77]  A claim is facially plausible when the complaint alleges facts that allow the court to draw a reasonable inference that the defendant is liable for the alleged misconduct.[78]  A complaint that does not permit the court to infer more than the mere possibility of misconduct has "alleged—but not shown—that the pleader is entitled to relief," and it must be dismissed.[79]

## B.    Fitzpatrick's state-law claims against Naphcare

Fitzpatrick disputes that her claims are grounded in professional negligence and argues that the expert-affidavit requirement does not apply here.[80]  She asserts that only ordinary negligence is at play because she is challenging Naphcare's failure to communicate Bowling's

---

[73] *Iqbal*, 556 U.S. at 678.

[74] *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1989)) (emphasis in original).

[75] *Iqbal*, 556 U.S. at 678–79.

[76] *Id.*

[77] *Id.* at 679.

[78] *Id.*

[79] *Twombly*, 550 U.S. at 570.

[80] ECF No. 96.

14

appropriate classification to LVMPD, which she claims has nothing to with the medical treatment it provided him. Naphcare responds that it could not have made a housing recommendation or informed LVMPD without having first exercised medical judgment, thereby triggering the expert-affidavit requirement.[81]

Nevada Revised Statute § 41A.015 defines "professional negligence" as "the failure of a provider of health care, in rendering services, to use the reasonable care, skill or knowledge ordinarily used under similar circumstances by similarly trained and experienced providers of health care." "Provider of health care" includes medical corporations that employ medical providers, like physicians and psychologists.[82] A plaintiff who brings a claim for professional negligence against a provider of healthcare must file an expert affidavit in support of that claim.[83] Failure to attach a qualifying affidavit renders the complaint void, and the "court shall dismiss the action[ ] without prejudice."[84]

Generally, "[a] claim is grounded in medical malpractice and must adhere to NRS § 41A.071 where the facts underlying the claim involve medical diagnosis, treatment, or judgment and the standards of care pertaining to the medical issue require explanation to the jury from a medical expert at trial."[85] But if the claims are based on the performance of nonmedical services, only ordinary negligence is at play.[86] This is not a hard and fast rule—the same set of facts may support both causes of actions, "and an inartful complaint" may misclassify the cause

---

[81] ECF No. 97.

[82] Nev. Rev. Stat. § 41A.017.

[83] *Id.* at § 41A.071.

[84] *Id.*; *Washoe Med. Ctr. v. Second Judicial Dist. Court*, 148 P.3d 790, 794 (Nev. 2006).

[85] *Szymborski v. Spring Mountain Treatment Ctr.*, 403 P.3d 1280, 1288 (Nev. 2017); *DeBoer v. Sr. Bridges of Sparks Fam. Hosp.*, 282 P.3d 727, 731–32 (Nev. 2012).

[86] *Szymborski*, 403 P.3d at 1284.

of action.[87]  "Therefore, [courts] must look to the gravamen or substantial point or essence of each claim rather than its form to see whether each individual claim is for medical malpractice or ordinary negligence."[88]

To determine whether Fitzpatrick's negligence-based claims are medical-malpractice claims, I must consider what legally cognizable duty she is alleging Naphcare had and breached.[89]  Fitzpatrick alleges that Naphcare failed "to make appropriate recommendations to LVMPD regarding appropriate classifications, housing, and protection of [Bowling] and/or fail[ed] to provide complete, accurate, and current information to LVMPD regarding [his] participation in his medical treatment [(i.e. compliance with medication and appointment)]," which resulted in his death.[90]  But Fitzpatrick's claims are so thinly pled that I am unable to ascertain the nature of the negligent conduct—medical, ordinary, or gross—that she has alleged against Naphcare.  Fitzpatrick's argument that the gravamen of this claim is limited Naphcare's lack of communication with LVMPD does not establish a claim for mere ordinary negligence because she has also alleged that Naphcare's recommendations were based on the inmates' "participation in medical treatment."[91]  Fitzpatrick has not alleged sufficient facts to show that Naphcare's recommendation "do[es] do not relate in any way to its provision of medical services or its exercise of medical judgment."[92]

---

[87] *Id*. at 1285 ("The distinction between medical malpractice and negligence may be subtle in some cases, and parties may incorrectly invoke language that designates a claim as either medical malpractice or ordinary negligence, when the opposite is in fact true.").

[88] *Id*.

[89] *See Zeigler v. Las Vegas Metro. Police Dep't*, 2015 WL 355422, at *6 (D. Nev. Jan. 27, 2015) (collecting cases).

[90] ECF No. 72 at 29–30.

[91] *Id*. at 29.

[92] ECF No. 96 at 2.

Had Fitzpatrick offered facts to explain what Naphcare's role in this housing or custody decision was, I could better decipher the nature of the duty she alleges it breached. But these facts are absent from the complaint and, without them, I cannot determine whether plaintiffs have sufficiently identified any legal duty on which these negligence-based claims may be based against this medical-care provider, let alone whether that duty categorizes these claims as medical-malpractice ones for which NRS § 41A.071 requires an affidavit. So, I dismiss each of these state-law claims under the standards set in *Iqbal* and *Twombly* with leave to amend, and I do not reach the NRS 41A.071 question.

## C.    Fitzpatrick's § 1983 claims against Naphcare

Fitzpatrick's first and second claims allege violations of 42 U.S.C. § 1983 under the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process and Equal Protection Clauses.[93] As I explain below, only the Eighth Amendment claim is appropriate here because, having pleaded guilty, Bowling was not a pretrial detainee to whom the Fourteenth Amendment's pre-trial-detainee's protections attached.[94]

An entity like Naphcare may not be held liable under § 1983 for the acts of its employees on a respondeat superior theory.[95] As the United States Supreme Court recognized in *Monell v. Department of Social Services*, plaintiffs must instead plausibly allege that "a deliberate policy, custom, or practice" of Naphcare "was the 'moving force' behind the constitutional violation"

---

[93] ECF No. 96 at 11, 17.

[94] *See infra* at pp. 25–26.

[95] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995); *Tsao v. Desert Palace*, 698 F.3d 1128, 1139 (9th Cir. 2012) (extending *Monell* liability to private entities acting under color of law).

Bowling suffered.[96]  Fitzpatrick inexplicably divorces the constitutional-violation component and the policy, practice, and custom component of her § 1983 claim into two separate counts that comprise her first and second causes of action.[97]  Because no plausible § 1983 claim against Naphcare can be pled without both of these components, I construe these first and second causes of action together as a single § 1983 claim to determine the sufficiency of this federal claim against Naphcare.

The Eighth Amendment protects prisoners from cruel and unusual punishment, and it requires prison officials to reasonably protect inmates from physical abuse by other inmates.[98] "[A] prison official violates the Eighth Amendment only when two requirements are met[: (1)] the deprivation alleged must be, objectively, 'sufficiently serious[,]' and (2) the prison official must have a "culpable state of mind," meaning "deliberate indifference to inmate health or safety."[99]

Fitzpatrick offers the right buzzwords: that Naphcare and the other defendants had a policy or practice "that exhibited deliberate indifference to" inmates' civil rights, "subjected or caused inmate[s] to be deprived of their . . . right to be protected from violence at the hands of another inmate," and that it is Naphcare's policy to "fail/neglect to make appropriate recommendations to LVMPD" about the inmates' classification, housing, and safety, and to fail to provide LVMPD with relevant medical information, which caused the death of Bowling by

---

[96] *Galen v. Cnty. of L.A.*, 477 F.3d 652, 667 (9th Cir. 2007) (citing *Monell*, 436 U.S. at 694–95; *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).

[97] ECF No. 72.

[98] *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982) *abrogated on other grounds by Sandin v. O'Connor*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

[99] *Id*. (internal quotations and citation omitted).

18

another inmate.[100]  Fitzpatrick further alleges that the risk of harm was so high that "no reasonable person would have authorized double-celling" Bowling and Sharp, but defendants did so despite that risk.[101]  But these are just conclusions, and the facts—even with generous inferences—do not support them.  The only facts that Fitzpatrick has alleged are that Bowling "was choked, beaten and killed while he was locked in a cell, unsupervised and unmonitored, with a known violent offender, Franklin Sharp, who had strangled [Joseph Barrese] only 34 days earlier";[102] unlike, Sharp, Bowling "had no prior criminal nor violent history and was inexperienced with the correctional system";[103] Bowling "was in a weakened and vulnerable mental state" and had expressed "want[ing] to hurt himself;"[104] defendant officers left Bowling and Sharp unsupervised;[105] and defendants "had sufficient information to properly assess and classify" Bowling and Sharp "to determine that they were incompatible" as cellmates.[106]

These facts are compelling.  But they do not give rise to the inference that Naphcare acted with a culpable mental state or with any deliberate indifference toward Bowling.  Plaintiffs have not alleged facts to suggest that Sharp presented a particular risk to Bowling or even that Naphcare employees were aware that Bowling expressed a desire to hurt himself, and nothing suggests that Naphcare employees had reason to anticipate an attack.  Thus, plaintiffs have failed

---

[100] ECF No. 72 at 17–22.

[101] *Id*. at 14.

[102] *Id*. at 18, 22, 23

[103] *Id*. at 13.

[104] *Id*.

[105] *Id*.

[106] *Id*

to state *facts* from which I can infer they have stated a plausible deliberate-indifference claim against Naphcare.

There is a second deficiency that justifies Rule 12(b)(6) dismissal: even if Fitzpatrick had stated a plausible deliberate-indifference claim, she has not sufficiently pled Naphcare's liability under a *Monell* theory. To plead Naphcare's liability under *Monell*, Fitzpatrick alleges that it is Naphcare's "policy, practice, and/or custom . . . to fail and/or neglect to make appropriate recommendations to LVMPD" about an inmate's classification, housing, or need to be protected from inmates, and to fail to provide to LVMPD "complete, accurate, and current information to LVMPD regarding [Bowling's] participation in medical treatment[, maintaining appointments and a medication regimen]."[107] But Fitzpatrick also alleges that the constitutional deprivation was the result of LVMPD's classification of Bowling and its assignment and lack of supervision of Bowling and Sharp.[108] This suggests that the alleged constitutional deprivation was not the result of a deliberate policy, practice, or custom as *Monell* requires, but rather the result of a single failure or violation by a LVMPD employee.

For *Monell* liability to attach, the challenged action must be the standard operating procedure of the municipality, not merely a single occurrence by a non-policymaking employee.[109] And while Fitzpatrick alleges that the United States Department of Justice's 1998 investigation of CCDC concluded that CCDC had a flawed design that obstructed supervision of the cells and that its classification policies resulted in inmates' death or injury by violent or

---

[107] *Id*. at 20.

[108] *Id*. at 19.

[109] *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016); *City of Okla. v. Tuttle*, 471 U.S. 808, 823–24 (1985).

mentally ill cellmates,[110] Fitzpatrick fails to plead facts to show how that decades-old finding implicates Naphcare. And though Fitzpatrick also references the 2011 death of CCDC inmate Francesco Sanfilippo by his cellmate, Carl Guilford, she fails to plead facts from which I can infer that Sanfilippo's death had anything to do with a Naphcare policy or was part of a larger pattern at CCDC.[111] Accordingly, Fitzpatrick's § 1983 claim based on an Eighth Amendment deliberate-indifference claim is also dismissed.

### D.     Leave to amend

Having dismissed all claims against Naphcare, I now consider whether to allow Fitzpatrick to amend her claims. When granting a motion to dismiss, courts "freely give leave [to amend] when justice so requires."[112] The tendency of federal courts is to allow new chances. The Ninth Circuit directs that "[t]his policy is to be applied with extreme liberality."[113] The Supreme Court has also counseled that, "[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."[114]

---

[110] ECF No. 72 at 24.

[111] *Id*. at 22.

[112] Fed. R. Civ. P. 15(a)(2); *see also Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013) (citing Fed. R. Civ. P. 15(a)); *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) ("In general, a court should liberally allow a party to amend its pleading")).

[113] *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985 (9th Cir. 2011) (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks omitted)).

[114] *C.F. ex rel. Farnan*, 654 F.3d at 985 (quoting *Eminence Capital*, 316 F.3d at 1051 (internal quotation marks omitted).

### 1. *Federal claims*

To the extent that Fitzpatrick can plead facts to support her § 1983 claim against Naphcare on a deliberate-indifference-to-safety theory, and while satisfying *Monell*, she may file an amended complaint. Fitzpatrick is reminded that neither her first nor second claim for relief as currently pled states a complete § 1983 claim against Naphcare; facts supporting both a constitutional violation and the *Monell*-required, moving-force policy, custom, or procedure must be pled to state a proper municipal-liability claim. If Fitzpatrick chooses to amend her complaint to plead a proper § 1983 deliberate-indifference-to-safety claim, it should be based on an Eighth Amendment deprivation, not a Fourteenth Amendment violation.

### 2. *State claims*

Because I dismissed Fitzpatrick's state-law claims based on the *Iqbal-Twombly* standard and not as void for failing to satisfy NRS § 41A.071's expert-affidavit requirement, she is permitted to amend her state-law claims against Naphcare if she can plead facts giving rise to cognizable legal bases for these claims. Fitzpatrick is cautioned that she should carefully consider the impact, if any, of NRS § 41A.071 and NRS § 41.032 in repleading her claims, and she should be mindful of the Nevada Supreme Court's holding in *Butler ex rel. Biller v. Bayer* that "prison officials have a specific duty to protect inmates only when they actually know of or have reason to anticipate a specific impending attack."[115]

---

[115] *Butler ex rel. Biller v. Bayer*, 168 P.3d 1055, 1064 (Nev. 2007) (adopting majority rule from *Cupples v. State*, 861 P.2d 1360, 1371–72 (Kan. 1993)).

**III.** **Defendants LVMPD, and Corrections Officers Streimer, Larry, and Trevino's motion for summary judgment [ECF No. 87].[116]**

**A.** **Summary-judgment standard**

Summary judgment is appropriate when the pleadings and admissible evidence "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[117] When considering summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party.[118] If reasonable minds could differ on material facts, summary judgment is inappropriate because its purpose is to avoid unnecessary trials when the facts are undisputed, and the case must then proceed to the trier of fact.[119]

If the moving party satisfies Rule 56 by demonstrating the absence of any genuine issue of material fact, the burden shifts to the party resisting summary judgment to "set forth specific facts showing that there is a genuine issue for trial."[120] The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"; she "must produce specific evidence, through affidavits or admissible discovery material, to show that" there is a sufficient evidentiary basis on which a reasonable fact finder could find in her favor.[121]

---

[116] All references are to the corrected image for this filing, ECF No. 87.

[117] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)).

[118] *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

[119] *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994).

[120] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Celotex*, 477 U.S. at 323.

[121] *Bank of Am. v. Orr*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991); *Anderson*, 477 U.S. at 248–49.

**B.  Fitzpatrick has standing to pursue both federal and state-law claims.**

Defendants argue that Fitzpatrick is unable to bring a survivor action for the violation of Bowling's constitutional rights as his mother and heir.[122]  Defendants rely on NRS § 41.100(3), which allows only a decedent's executor or administrator to recover damages on behalf of the decedent, and the Ninth Circuit's decision in *Moreland v. Las Vegas Metro. Police Department*, which held that a parent and child of a decedent who was allegedly killed by an officer could not bring an excessive force claim under § 1983 and the Fourth Amendment because Nevada law requires survival actions to be brought by the representatives of the decedent's estate.[123]  But *Moreland* also explains that the parent and child could bring a Fourteenth Amendment claim and a wrongful-death claim as the decedent's survivors.[124]  As Fitzpatrick notes, she is suing both as a surviving parent and as an official co-administrator of Bowling's estate, and Nevada law authorizes her, as heir, to file claims for wrongful death and negligence.[125]  Thus, she may pursue the Eighth Amendment[126] claim as special co-administrator of Bowling's estate and the state-law wrongful-death claim as both his heir and special co-administrator of his estate.

---

[122] ECF No. 86 at 7.

[123] *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369–72 (9th Cir. 1998), *as amended* (Nov. 24, 1998).

[124] *Id.* at 370 (citing Nev. Rev. Stat. § 41.085).

[125] ECF No. 98 at n.1 (opposition); ECF No. 72 (fourth amended complaint).  *See* Nev. Rev. Stat. §§ 41.085, 41.100(3), and 140.040(2).

[126] As I explain *infra*, Fitzpatrick's first cause of action—Violation of Bowling's Fourteenth and/or Eighth Amendment rights under § 1983—is best characterized as one under the Eighth Amendment given his status as an adjudicated inmate.  *See infra* at 25–26.  So, I need not address whether Fitzpatrick would have standing under the Fourteenth Amendment.

### C. Bowling's constitutional rights derived from the Eighth Amendment.

Before getting to the merits of Fitzpatrick's § 1983 claims, it is important to determine which body of law I must apply to this summary-judgment motion. Defendants argue that the Eighth Amendment standard controls because Bowling's guilty plea made him a convicted prisoner, taking him outside the scope of the Fourteenth Amendment's protections for pretrial detainees.[127] Fitzpatrick responds that it is the Fourteenth Amendment that applies because Bowling remained a pretrial detainee while he was awaiting sentencing.[128] This distinction is important: if Bowling were a pretrial detainee, then he would have been "entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment."[129] Conversely, Bowling could be punished as a "sentenced inmate" provided that the punishment was not "cruel and unusual" under the Eighth Amendment.[130]

Though United States Supreme Court jurisprudence often contrasts the rights of pretrial detainees from those of "sentenced inmates," this does not mean, as Fitzpatrick asserts, that the Supreme Court displaced other adjudicated but not-yet sentenced individuals beyond the Eighth Amendment's reach.[131] The leading cases on this issue—*Bell v. Wolfish* and *Graham v.*

---

[127] ECF No. 87 at 27–28.

[128] ECF No. 98 at 4 (internal quotation marks omitted).

[129] *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016).

[130] *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979).

[131] *Compare Bell*, 441 U.S. at 537 n. 16 ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. . . . A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment.") *with Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") *and Graham v. Connor*, 490 U.S. 386, 393 n.6 (1989) (explaining that

*Connor*—rely on a footnote in *Ingraham v. Wright* in which the Court explained: "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law."[132]  Neither *Bell* nor *Graham* narrowed the Court's application of the Eighth Amendment to only those inmates who have been sentenced.  Likewise, Fitzpatrick points to no case, and I have found none, that limits *Ingraham*'s holding to only sentenced inmates.  In fact, the opposite holds true.  The Court explained—a decade before *Ingraham* and its progeny—that "a plea of guilty is more than an admission of conduct; it is a conviction"[133] and thus constitutes "a formal adjudication of guilt."[134]  Because Bowling pleaded guilty, he was no longer a pretrial detainee, and it is the Eighth Amendment that supplies the standard for the constitutional claims here.

## D.    Fitzpatrick's § 1983 claims

Section 1983 "is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred."[135]  To state a claim under § 1983, a plaintiff must allege that (1) a person acting under color of state law (2) violated a right secured to

---

*Ingraham* stands for the proposition "that the Eighth Amendment's protections did not attach until after conviction and sentence").

[132] *Ingraham*, 430 U.S. at 671 n.40.

[133] *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).

[134] *Ingraham*, 430 U.S. at 671 n.40.  *See also Betterman v. Montana*, 136 S. Ct. 1609, 1613–18 (2016) (explaining that a guilty plea had the legal effect of a conviction even though the defendant had not yet received his sentence); *Berry v. City of Muskogee*, 900 F.2d 1489, 1493 (10th Cir. 1990) ("We see no reason to treat incarcerated persons whose guilt has been adjudicated formally but who await sentencing like pretrial detainees, . . . and we perceive every reason to treat those awaiting sentencing the same as inmates already sentenced.  The critical juncture is conviction, either after trial or, as here, by plea, at which point the state acquires the power to punish and the Eighth Amendment is implicated.") (citing *Bell*, 441 U.S. at 534–35 and *Ingraham*, 430 U.S. at 664)).

[135] *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

plaintiff by the Constitution or the laws of the United States.[136]  Defendants do not contest that

they acted under color of state law, so the inquiry turns on whether they violated Bowling's

Eighth Amendment rights.

Defendants also contend that they are entitled to qualified immunity.  Qualified immunity

shields state actors from monetary liability under § 1983 unless (1) the facts alleged by the

plaintiff establish a violation of the plaintiff's constitutional rights and (2) the constitutional right

in question was "clearly established" when the alleged misconduct occurred.[137]  A state official

enjoys qualified immunity if he "reasonably believes that his conduct complies with the law."[138]

Because both § 1983 and the qualified-immunity doctrine require me to determine whether

defendants violated Bowling's constitutional rights, I address them together.

### 1.  *Violation of a constitutional right*

The Eighth Amendment protects prisoners from cruel and unusual punishment and

"requires that inmates be furnished with the basic human needs, one of which is reasonable

safety."[139]  "Prison officials have a duty to take reasonable steps to protect inmates from physical

abuse."[140]  "It is not, however, every injury suffered by one prisoner at the hands of another that

translates into constitutional liability for prison officials responsible for the victim's safety."[141]

"[A] prison official violates the Eighth Amendment only when two requirements are met[: (1)]

the deprivation alleged must be, objectively, "sufficiently serious[,]"  and (2) the prison official

---

[136] *West v. Atkins*, 487 U.S. 42, 48–49 (1988).

[137] *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).

[138] *Id*. at 244.

[139] *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (internal quotation marks omitted).

[140] *Hoptowit v. Ray*, 682 F.2d 1237, 1250 (9th Cir. 1982).

[141] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

must have a "culpable state of mind," meaning one of "deliberate indifference to inmate health or safety."[142]  The former is an objective inquiry, and the latter is subjective.[143]

### a.  Serious deprivation

For a failure-to-protect claim "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."[144]  That risk may come from multiple sources, no matter whether the risk is personal to the specific inmate or one that all inmates face.[145]  There may be a substantial risk of harm to an inmate where the prison double-cells an inmate with a history of attacking other cellmates with a non-violent inmate,[146] particularly "when the cell had no audio or video surveillance and only occasional monitoring."[147]  Neither party disputes that Bowling faced a risk of harm from being housed in the two-person cell with Sharp one month after Sharp attempted to kill his previous cellmate and directly after his release from disciplinary custody.[148]  Instead, the parties dispute whether LVMPD misclassified Sharp and Bowling, thus allowing them to be celled together, and whether Officer Streimer—who was new to the unit the day of the attack—knew that Bowling faced a risk and failed to intervene.[149]

---

[142] *Id.* (internal quotations and citation omitted).

[143] *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

[144] *Farmer*, 511 U.S. at 834 (internal citation and quotation marks omitted).

[145] *Id.*

[146] *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050, 1052 (9th Cir. 2002) (explaining that the risk of harm in double-celling a violent inmate with a non-violent one was not clearly established when the inmates "had been celled together before without a problem, and both wanted to be celled together again.").

[147] *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1067 (9th Cir. 2016).

[148] ECF No. 98 at 15, 22; ECF No. 99-7 (Sharp's locator card).  Defendants do not discuss this element, focusing instead on their qualified-immunity arguments.  *See, e.g.*, ECF No. 86 at 24–27.

[149] ECF No. 98 at 22–23; ECF No. 102 at 16.

### b. Deliberate indifference and qualified immunity

"Determining whether a public official is entitled to qualified immunity 'requires a two-part inquiry: (1) Was the law governing the state official's conduct clearly established?  (2) Under that law could a reasonable state official have believed his conduct was lawful?'"[150]  The plaintiff need not identify a case "directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."[151]  "This standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"[152]  "If a genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial."[153]

The first part of the inquiry is not subject to dispute because the Eighth Amendment right to be safe from violence from other inmates is clearly established law.[154]  The United States Supreme Court explained in *Farmer v. Brennan* that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety."[155]  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial

---

[150] *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Browning v. Vernon*, 44 F.3d 818, 822 (9th Cir. 1995)).

[151] *Id.*

[152] *Id.* (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (per curiam) and quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

[153] *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

[154] *Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.") (internal quotation marks omitted); *Robinson v. Prunty*, 249 F.3d 862, 866 (9th Cir. 2001) ("Deliberate indifference to the risk that an inmate will be harmed by other prisoners constitutes a violation of the Eighth Amendment.").

[155] *Farmer*, 511 U.S. at 837.

risk of serious harm exists, and he must also draw the inference."[156]  Thus, Eighth Amendment liability will not lie based on "an official's failure to alleviate a significant risk that he should have perceived but did not."[157]  This is a subjective standard,[158] but a plaintiff may demonstrate with circumstantial evidence that the officer "knew of a substantial risk from the very fact that the risk was obvious."[159]

*Farmer* does not explain at what point a risk becomes obvious enough for Eighth Amendment liability to attach, but the Ninth Circuit has looked at known facts and mitigating circumstances to determine whether an officer's failure to act constitutes deliberate indifference.[160]  In *Estate of Ford v. Ramirez-Palmer*, a death-by-cellmate case, the Ninth Circuit concluded that a reasonable officer would not have necessarily suspected a substantial risk of harm to an effeminate, homosexual psychiatric inmate by double-celling him with another psychiatric inmate who was designated as a "predator" to homosexual inmates where the two had requested to be celled together, the homosexual inmate was not a designated "victim," and the two had previously been celled together without incident.[161]  The officer who approved the cell assignment was new to the unit but was informed by other officers in the unit that the inmates were not enemies, had no gang-related conflict, and were not a predator-victim combination.[162] Before approving the request, however, the assigning officer was required to review each

---

[156] *Id.*

[157] *Id.* at 838

[158] *Snow*, 681 F.3d at 985.

[159] *Farmer*, 511 U.S. at 842.

[160] *Estate of Ford*, 301 F.3d at 1051–52.

[161] *Id.* at 1046–47, 1052.

[162] *Id* at 1052.

inmate's central file and other documents to ensure that the assignment was safe.[163]  The officer

failed to do so but, if he had, he would have learned about the predator-inmate's extensive

history of violence towards cellmates and staff, which may have rendered him inappropriate for

double-celling.[164]  Nonetheless, the court concluded that the officer was entitled to qualified

immunity because, based on the information before him, there was not an "intolerable risk of

serious injury."[165]  The court also rejected the plaintiff's argument that the officer was not

entitled to qualified immunity based on his failure to investigate.  It explained, "[f]ailure to

follow prison procedures, which called for [investigating the inmates' files] before making a

housing decision, was certainly negligent; but negligence or failure to avoid a significant risk

that should be perceived but wasn't, 'cannot be condemned as the infliction of punishment.'"[166]

Other courts have also considered aggravating and mitigating facts in the qualified-

immunity inquiry.  For example, in *Mooring v. San Francisco Sheriff's Department*, the court

likewise extended qualified immunity to an officer who celled an inmate who expressed "'gang

affiliation' concerns" but neither identified himself as or was classified as a member of the

Norteno gang, with rival gang members.[167]  Absent a specific threat or notice of the gang conflict

that was disregarded, the court determined that the officer was entitled to qualified immunity.[168]

---

[163] *Id.*

[164] *Id.*

[165] *Id.*

[166] *Id.* (quoting *Farmer*, 511 U.S. at 838).  *Cf Farmer*, 511 U.S. at 843 n.8 ("While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him . . . he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist.").

[167] *Mooring v. San Francisco Sheriff's Dept.*, 289 F. Supp. 2d 1110, 1120 (N.D. Cal. 2003).

[168] *Id.*

### i.  Officers Larry and Trevino

Defendants argue that none of its three officers—Angelo Larry, Rolando Trevino, and Thomas Streimer—was deliberately indifferent to any serious risk of harm to Bowling because they were unfamiliar with the inmates in the unit and were not involved in the classification process for either inmate. [169]  Fitzpatrick does not offer any facts to impute prior knowledge to officers Larry or Trevino, nor does she oppose their summary-judgment requests.  With no genuine issues of fact as to whether Officers Larry and Trevino were deliberately indifferent to any risk of harm to Bowling,[170] I grant summary judgment in their favor.

### ii.  Officer Streimer

Fitzpatrick's § 1983 claim against Officer Streimer can be split into two components: Officer Streimer's acts or commissions before the attack and those during and after it. Fitzpatrick relies on CCDC's policy that required officers to review the locator cards for a face-to-card count at least once a day to identify who was in the unit and what charges each inmate had.[171]  That check was supposed to occur between 3:00 p.m. and 3:30 p.m. each day,[172] but Officer Streimer could not recall whether he reviewed the cards for Sharp, Bowling, or any other inmate in the unit that day.[173]  If he had, he may have been alerted to Sharp's violent history and attempt to strangle his previous cellmate the previous month, along with the fact that Sharp was immediately housed with Bowling after being in disciplinary housing.[174]

---

[169] ECF Nos. 86 at 24–26, 88-6 at 28, 89-1 at 29, 90-1 at 23–24.

[170] *See* ECF No. 98 at 10 n.6.

[171] ECF Nos. 98 at 15, 88-6 at 14, 99-6 at 4 (policy).

[172] *Id.*

[173] ECF No. 88-6 at 14.

[174] ECF No. 99-7.

But under *Estate of Ford*, Officer Streimer would be entitled to qualified immunity even if did not review the locator cards based on the missing notice of a specific risk. There is no evidence that Officer Streimer was involved in the housing-assignment or classification process for either Bowling or Sharp or that either inmate requested to be assigned to another cell. Fitzpatrick also has not shown that Bowling and Sharp's housing assignments were inconsistent with their classifications; neither was classified as a victim or predator or affiliated as a member of a rival gang. Instead, both had the same close-custody classification. Based on the information before him, Officer Streimer had no reason to think that Sharp was "excessively dangerous or that he posed any particular danger to" Bowling.[175] And because there is no evidence that would have alerted Officer Streimer of a specific risk to Bowling to prompt him to review the locator cards or other documents, in the words of the *Estate of Ford* court, his failure to review the locator cards "cannot be condemned as the infliction of punishment."[176] Officer Streimer is therefore entitled to qualified immunity on Fitzpatrick's theory that his failure to review the locator cards constitutes deliberate indifference.

Fitzpatrick's theory that Officer Streimer failed to conduct a proper visual check of Cell 21 and failed to respond to "external evidence" of the attack, however, does not trigger qualified immunity so clearly.[177] It is CCDC's policy that the officer on a unit must conduct a visual check of the cell every 30 minutes "to visually ensure the welfare of each inmate."[178] Fitzpatrick relies on surveillance footage for the unit to argue that Officer Streimer "(maybe) glanced inside

---

[175] *Estate of Ford*, 301 F.3d at 1052.

[176] *Id.* (internal quotation marks omitted).

[177] ECF No. 98 at 15–19.

[178] *Id.* at 17; ECF No. 99-6 at 10.

33

for a fraction of a second" inside the cell.[179]  She also points to the fact that the CCDC reprimanded Officer Streimer "for failure to perform a full and proper visual check, potentially delaying the discovery of a homicide scene."[180]

The deficient visual check is important because the evidence shows that the attack occurred at least six minutes before Officer Streimer conducted his last visual check.  Inmate Joshua Beebe reported that he heard Bowling and Sharp fighting while he was watching television and cleaning the area.[181]  According to Beebe, it sounded like "[Bowling's] head that was bein' hit on the grou[nd], you could feel it through the whole floor pretty much."[182]  Beebe and another inmate approached Cell 21's window at 4:52 p.m. and told Sharp to get off of Bowling two or three times.[183]  The surveillance video does not show Officer Streimer in the unit at that time.[184]  Two minutes later, inmate Andrew Snyder called his girlfriend from a phone bank by Cell 22.[185]  The transcript from that recorded call reflects that Snyder told his girlfriend that "there are two dudes in [t]here fighting" and ordered another inmate to get a mop and a cleaning chemical to clean up the blood that was coming out of the cell.[186]

---

[179] *Id.*

[180] ECF No. 88-6 at 27; ECF No. 99-8.

[181] ECF No. 99-9 at 4–5.

[182] *Id.* at 10.

[183] *Id.* at 5, 8–9; ECF No. 99-4.

[184] *Id.*

[185] ECF No. 90-3 at 15; ECF No. 100-1 (Snyder's interview).  Snyder later stated in an interview with a detective that it was Sharp who called Johnny to mop outside the cell.  *Id.* at 16–17. Snyder also stated in that interview that he couldn't actually hear anything going on in the cell, but that he told his girlfriend over the phone that something was going on because of the blood in front of the door.  *Id.* at 23; ECF No. 99-4.

[186] ECF No. 99-4.

When Officer Streimer announced that there were ten minutes left until lockdown, Beebe retreated to his cell.[187] Beebe continued to hear a "beating" after that, "almost like a bowling ball hittin' the ground."[188] He described the noise after as "loud enough for the whole [module]" to hear.[189] Other inmate workers heard yelling and saw Bowling lying on the floor.[190]

Officer Streimer testified at deposition that, as part of his visual checks, he would attempt to look into the cell window to confirm that both inmates are in the cell and get a verbal response if he was unable to see the inmate.[191] The surveillance footage shows that Officer Streimer conducted his last check at 5:01 p.m., and that he turned his head to look into Cell 22 for less than a second, but it doesn't seem to show him turning to look into Cell 21.[192] Beebe saw Officer Streimer do the last visual check and explained that he "looked in there, but just kept on goin'."[193] And Officer Streimer testified that he was satisfied with his final visual check.[194]

This conflicting evidence about the conspicuousness of the risk to Bowling from Officer Streimer, the inmates, and the surveillance video creates genuine issues of fact about whether Officer Streimer heard the noises emanating from Cell 21 minutes before and after he conducted his last visual check, heard that there was blood outside the cell, saw an inmate mopping up blood, or saw the inmates go to Cell 21's window, such that the risk of harm to Bowling was obvious. Because it is not clear from this record whether a reasonable officer in Streimer's

---

[187] ECF No. 99-9 at 6.

[188] *Id.*

[189] *Id.* at 7.

[190] ECF Nos. 100-2, 100-1.

[191] ECF No. 88-6 at 29–30.

[192] ECF No. 99-4.

[193] *Id.* at 5–6.

[194] ECF No. 88-6 at 33.

position would have recognized the risk to Bowling, genuine issues of fact prevent me from finding that Officer Streimer is entitled to qualified immunity on Fitzpatrick's theory that he failed to conduct a proper visual check and ignored evidence of the attack.

### E. Municipal liability

There is no *respondeat superior* liability for § 1983 claims; a municipal entity is liable if the plaintiff shows that the execution of a municipal policy caused the constitutional injury.[195] But it is not enough for a plaintiff to identify the injury-causing policy alone; "[a] plaintiff must also demonstrate that the custom or policy was adhered to with 'deliberate indifference to the constitutional rights of [the jail's] inhabitants.'"[196] This is an objective inquiry.[197] "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."[198]

Fitzpatrick alleges that LVMPD had a policy of double-celling violent inmates with non-violent inmates and leaving them unsupervised or unmonitored, and that this policy deprived inmates of their right to be protected from other inmates and constituted a deliberate indifference to their safety.[199] Fitzpatrick contends that this policy is evidenced in three ways: (1) the deaths of Bowling and Francesco Sanfilippo (which happened five years earlier), (2) Sharp's attempted strangulation of Barrese the previous month, and (3) a 1998 investigation by the United States

---

[195] *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[196] *Castro v. Cty. of L.A.*, 833 F.3d 1060, 1076 (9th Cir. 2016) (quoting *City of Canton v. Harris* 489 U.S. 378, 392 (1989)).

[197] *Id.*

[198] *City of Canton*, 489 U.S. at 396.

[199] ECF No. 72 at 19.

Department of Justice that concluded that CCDC had a pattern of misclassifying violent or mentally ill inmates and that the cells had a flawed design that impeded the supervision of inmates.[200]

LVMPD argues that Fitzpatrick has not met her burden to show that there was a department-wide policy of misclassifying and supervising inmates with these three incidents.[201] To refute her allegations, LVMPD submits its housing, special-housing, and classification policies, along with the report of its expert, John G. Peters, to certify that its policies met national accreditation standards.[202] It also submits Officers Streimer, Larry, and Trevino's training files to show that LVMPD trained the officers on these policies.[203]

Fitzpatrick attempts to create a genuine issue of material fact through her expert, Michael A. Berg, who concludes that LVMPD misclassified Bowling as "Male Close Security"—the second highest classification—when the appropriate classification for a non-violent, first-time offender like Bowling was minimum security.[204] Berg also concluded that Sharp should have been classified as a maximum-security inmate—not close security—based on his extensive, violent criminal history, attempted strangulation of his previous cellmate, and recent stay in disciplinary custody.[205]

Even if it was error to classify either or both of these inmates as close security, Fitzpatrick does not connect Bowling's death to a department-wide policy. Fitzpatrick likewise

---

[200] *Id*. at 22–28; ECF No. 100-5 at 29–40.

[201] ECF No. 87 at 32.

[202] ECF No. 90-5 (general housing policy), 90-6 (special housing), 91-1 (classifications), 91-3 (expert report), 91-4 (rebuttal).

[203] ECF No. 91-2 (training files).

[204] ECF No. 100-5 at 29 (internal quotation mark omitted).

[205] *Id*. at 30.

fails to submit evidence of the classification for Barrese, Sanfilippo, and Sanfilippo's attacker, or how those attacks were connected to a policy or pattern of deliberate indifference.[206] Fitzpatrick also does not show how the DOJ's decades-old findings apply today. This single incident is insufficient to impose municipal liability, particularly where Fitzpatrick has not yet shown that Bowling's death "was caused by an existing, unconstitutional municipal policy."[207] And having conceded that summary judgment is appropriate for Officers Larry and Trevino, Fitzpatrick's mere allegation that LVMPD failed to train only Officer Streimer likewise fails to establish *Monell* liability.[208]

## F. Wrongful-death claim

Finally, I consider Fitzpatrick's state-law wrongful-death claim against Officer Streimer.[209] The defendants argue that Officer Streimer is not liable for wrongful death and, alternatively, that discretionary immunity shields him from any liability.[210] The defendants contend that Fitzpatrick can't show that Officer Streimer "had anything to do with [Bowling's death]" because Sharp's risk to Bowling was not foreseeable and his conduct—the arguably deficient visual check—was not the proximate cause of Bowling's death.[211] Fitzpatrick responds that there is a genuine issue of material fact about whether Officer Streimer could and should have taken steps to prevent Bowling's death and that he was negligent by failing to review the

---

[206] ECF No. 98 at 24.

[207] *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985).

[208] *See Navarro v. Block*, 72 F.3d 712, 714–15 (9th Cir. 1995) ("Proof of random acts or isolated events is insufficient to establish custom.").

[209] ECF No. 72 at 29.

[210] ECF No. 87 at 32–34.

[211] *Id*. at 34.

locator cards, conduct a proper visual check, or "respond to the obvious signs of violence occurring in Cell 21."[212]

Nevada law allows a decedent's heirs or estate representatives to bring "an action for damages against the person who caused the death [by wrongful act or neglect]."[213] "Negligence is never presumed but must be established by substantial evidence."[214] In *Butler ex rel. Billver v. Bayer*, the Nevada Supreme Court considered a prison's duty to protect an inmate from an intentional attack by another inmate. The *Butler* court held that the state has a duty to protect inmates from foreseeable harm only,[215] and prison officials have a specific duty to protect an inmate from an intentional attack by another inmate only when the officials actually know of or have reason to anticipate a specific impending attack.[216] But because genuine issues of material fact exist about whether Officer Streimer could have discerned the risk of harm to Bowling from his last visual check or the noise and activity in the module, as I discussed above, I cannot grant Officer Streimer summary judgment on this claim.

I also cannot conclude that Officer Streimer is shielded from this claim by discretionary immunity. Acts that violate the Constitution are not discretionary.[217] And Fitzpatrick's wrongful-death claim is premised on the same deliberate-indifference allegations that undergird

---

[212] ECF No. 98 at 29–32.

[213] Nev. Rev. Stat. § 41.085.

[214] *Eggers v. Harrah's Club, Inc.*, 476 P.2d 948, 950 (Nev. 1970).

[215] *Butler ex rel Biller v. Bayer*, 168 P.2d 1055, 1063 (Nev. 2007).

[216] *Id*. at 1064.

[217] *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("In general, governmental conduct cannot be discretionary if it violates a legal mandate.").

her Eighth Amendment claim under § 1983. So, I deny defendants' motion for summary judgment on Fitzpatrick's wrongful-death claim.

**Conclusion**

Summary judgment is entered in favor of Defendants Larry, Trevino, and the Las Vegas Metropolitan Police Department on all claims against them. Summary judgment is entered in favor of Defendant Streimer on plaintiffs' deliberate-indifference claim based on Streimer's failure to review inmate-locator cards; it is denied on all remaining theories. And the claims against Naphcare are dismissed with leave to amend.

Absent timely amendment to replead claims against Naphcare, this case proceeds on the plaintiffs' deliberate-indifference claim against Defendant Streimer based on his failure to respond to the attack and plaintiffs' wrongful-death claim only.

**IT IS THEREFORE ORDERED** that the defendants' objection to the magistrate judge's order granting and denying in part plaintiff's motion to compel **[ECF No. 123] is OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant Naphcare's motion to dismiss **[ECF No. 93] is GRANTED.** All claims against Naphcare are DISMISSED without prejudice to plaintiffs' ability to amend their claims consistent with this order by February 13, 2020.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment **[ECF No. 86] is GRANTED IN PART AND DENIED IN PART**. Partial summary judgment is entered against the plaintiffs on all claims against Defendants Larry, Trevino, and the Las Vegas Metropolitan Police Department; and on the deliberate-indifference claim based on Streimer's failure to review inmate-locator cards; it is denied on all remaining theories.

**IT IS FURTHER ORDERED** that this action is referred to a magistrate judge other than magistrate Judge Weksler for a mandatory settlement conference.

DATED February 3, 2020.

_____
Jennifer A. Dorsey
United States District Judge